Case 22-3587, United States of America v. Sterling Roberts, argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellate. Thank you. Good morning, Your Honors, and may it please the Court. I'm here this morning representing Sterling Roberts, and I believe I have reserved 3 minutes for rebuttal, if I may. Fine. Thank you, Your Honor. Your Honors, I raised several issues in my brief, and I'd really just like to focus the Court's attention on the first one of those today, unless the Court has any questions with regards to the other issues. Otherwise, I would just leave those to the briefs that have been filed. The issue that I'd like to discuss with the Court today is the twofold issue of the pervasive hearsay that was used in order to convict Mr. Roberts, along with the confrontation clause violations that occurred at the trial, which also served to convict Mr. Roberts. All of those hearsay problems with the case and also the confrontation clause problems with the case revolved around the decedent, Mr. Caldwell. As the government admits, two of the pieces of evidence were testimonial in nature and therefore involved the confrontation clause they were objected to at the time of trial, and therefore this Court has a de novo review as to those matters. As to the hearsay objections, and those revolve around the hearsay exception being excited utterance, those are rules of evidence issues, and so those fall under an abuse of discretion standard. So turning first to the confrontation clause problem in this case, we have two pieces of evidence. One is that Mr. Caldwell's written statement to the police was read into the record in its entirety to the jury. Second, we have his affidavit that he put together with the assistance of his domestic relations lawyer in anticipation of testimony and or evidence in a domestic relations court. That also was read in its entirety to the jury in this matter. Of course, because Mr. Caldwell was no longer with us, Mr. Roberts' attorneys had no opportunity to cross-examine Mr. Caldwell's to those statements either at this trial or at any prior proceeding under oath such that the right to confrontation was provided in this case. So as I understand it, the basis for allowing those in were the forfeiture by wrongdoing exception in that Roberts, your client, killed Caldwell. Yes. Yes, Your Honor. And so let's turn to the forfeiture by wrongdoing. And as Giles v. California tells us, that it is not just that a litigant prevents a witness from testifying in a proceeding, but that the litigant prevented that witness from testifying in the proceeding for the purpose of getting them to not testify at that proceeding. So in other words, Giles is very specific and says that in that case it was... Well, it wasn't a purpose here because there was this ongoing custody dispute between Caldwell and Caldwell's ex-wife, who was the girlfriend, I believe, of your client. So the reason that there was no evidence that the purpose of the conduct was to prevent testimony comes from the government's case itself. And the government's entire theory of prosecution was that there was this interstate stalking that occurred, and it occurred long before the events that led to Mr. Caldwell's death. And actually, the underpinning of the meat of the testimony or the evidence is what proves the government wrong in this case. Because the evidence is about an incident, what everyone refers to as the Jamestown incident, which is an incident where Mr. Caldwell says that Mr. Roberts confronted him with a firearm and threatened him, and then Mr. Caldwell drove away. So there was already an intent, at least this is the government's theory of prosecution, there was already an intent to kill Mr. Caldwell at that time. And that was not in... Not wanting to kill Caldwell at that time, but also wanting to kill Caldwell later because Caldwell was going to testify in the custody matter. Certainly it's possible that that could occur, but there's no evidence in the record that those are, in fact, the facts in this case. So the problem with the government's argument in this regard with regards to forfeiture by wrongdoing is that there's no objective evidence that Mr. Roberts or anyone said, we need to get rid of Mr. Caldwell now because he's going to testify as to this Jamestown incident. Isn't there a logical inference that that's part of the reason? Well, it's no more logical of an inference than the opposite conclusion, which was that Mr. Roberts, again, pursuant to the government's theory of prosecution, Mr. Roberts had the intent to kill Mr. Caldwell, that he attempted to do so on that day in Jamestown, that he missed and he continued on with that same intent later on. To add in the additional, all right, well now not only do I want to kill him, but I want to kill him to prevent this testimony in this other state potential criminal matter, of which there was none even going on at that point. There has to be at least some evidence in the record to support that. And I would submit that we can't just guess at it because this, again, is a confrontation clause issue and it's one of only, the Supreme Court, both in Crawford and in Giles, said that the confrontation clause has very, very limited exceptions and those limited exceptions should be exceedingly rare as well. In the Giles case, they even went through almost this scenario because there was a discussion between the majority in Giles and the dissent in Giles about domestic violence and domestic relations cases because the dissent wanted to say that, well, in a domestic violence or domestic relations case, of course you would have this dual intent, as your Honor has indicated, just because of the surrounding facts of the case. And the majority in Giles said we can't carve out a separate confrontation clause for domestic relations and domestic violence cases. There has to be evidence in the record about the purpose being to prevent this testimony. And in this case, there's absolutely no evidence in the record that shows that the purpose of what occurred later was to prevent that testimony. And certainly, there's no evidence in the record that it would prevent the testimony of the federal trial later on on the interstate stocking charges. So the evidence that one might hypothesize in another kind of case would be that the defendant made some statement like I'm going to kill you because I don't want you to testify. Yeah, or something along the lines of you'll never get to court to say that or some evidence in the record to at least support that additional fact to get you over the hump to do away with the confrontation clause. Because that's what we're talking about here is we're talking about doing away with what otherwise is an ironclad confrontation clause right in this matter. So does the harmless error standard apply to this type of alleged error? Yes, as the government concedes, it's actually harmless beyond a reasonable doubt. So it's the original Chapman harmless error standard that it must be harmless beyond a reasonable doubt. And you're arguing that the government hasn't shown that either? Well, our argument is that with this particular witness or non-witness, because they were the decedent in the case and because they were the focal point of the trial, their non-testimony testimony obviously carried a lot of weight and would have carried a lot of weight with the jury in terms of what occurred. And keep in mind that the government in this case chose to kind of split up the charges on the interstate stalking. They kind of separated the Jamestown incident from what occurred later where the shooting occurred. And so the jury had to determine what occurred at Jamestown separately from what occurred later. And so because of that, the weight of what Mr. Caldwell said in those two documents would have been given great weight by the jury as to that count. And then that kind of leads into the other part of the problem, which is the hearsay problem and excited utterance. So in this, again, all occurs at the same time as the Jamestown incident. So there's this confrontation in Jamestown and Mr. Caldwell gets into his car. He calls 911. After he calls 911, he calls his wife. After he calls his wife, he calls his attorney. And originally, the defense argued that in the court below that none of those three statements were admissible because of the excited utterance. On appeal, we are essentially conceding the 911 call is admissible. We have not challenged that. There's plenty of case law from this court on the admission of 911 calls in spite of the confrontation clause because of excited utterance. But it's when you get beyond that first call that the problems arise with regards to excited utterance because now Mr. Caldwell has had time to reflect and now Mr. Just moments, right? Because he calls 911 and then his wife. Yes. They're sequential to each other. But obviously, I don't know how there could not have been time to reflect, especially when you get to the third call because now you're calling your attorney to talk about the domestic relations case. That is not in reaction to an event without time to reflect. In this court's cases, and I cited the court to the Ellis case, where there was that 15-minute walk or not 15-minute walk, 15-feet walk between the car and going back to the other car. And that was held that there was time to reflect during that time. Certainly, the minutes that passed. And if you listen to the 911 call, even though we admit that was admissible, it hardly shows a level of non-reflection that gets you to excited utterance for the next two calls. Those are designed to further some action and are not just a mere reflection of what he's feeling at the time. And therefore, those were admissible as well. I see my time is up. Unless there are any further questions on this or any other issue, we would ask that you reverse the convictions in this case. Thank you. Thank you. May it please the court, Kevin Kohler on behalf of the United States. This court should affirm Roberts' conviction and sentence. As with my colleague, I'll focus on the first issue, but I'm happy to entertain any questions on any of the other issues if the court would like. The district court promptly admitted the various statements of Mr. Roberts. That includes both the two testimonial statements under the forfeiture by wrongdoing exception and also the various phone calls to his wife and to his lawyer, which were admitted. The lawyer's call was admitted under the excited utterance exception. There was actually no contemporaneous objection to the phone call to his wife, but the government's position is that fourth in our brief is that would be admissible under the excited utterance. And additionally, both those phone calls would also be admissible under the forfeiture by wrongdoing exception, which would apply to all of the statements, even the non-testimonial statements under 804B6. Focusing on the testimonial statements first, the district court did not err in finding that the forfeiture by wrongdoing exception applied here because the preponderance of the evidence established both that Sterling Roberts did, in fact, cause Robert Caldwell's unavailability by killing him, and there's no dispute to that on appeal. And also, I think the crux of the appeal here is whether or not Roberts killed Caldwell, in part to keep him from testifying. The government's position is that it was a mixed motive killing, which is permissible. I think you cite Jackson, which cites a number of cases. You have the initial motive about the custody hearing, but after the August 5th incident, there is evidence that he had an additional motivation, and this additional motivation drove in part the August 15th killing. And what specifically is that evidence, the additional motivation? So first, you have the evidence that Sterling Roberts knew that Caldwell had gone to the police and was cooperating with the police, and that is an important piece of the puzzle in all the cases, and that supports, I think, what Judge Moore referred to as the logistical inference. But we have more here as well. We know that the fact that Caldwell was cooperating became a problem for Sterling Roberts. First, we know that he absconded to Tennessee shortly after learning that Caldwell was cooperating with police, which again indicates that he was worried about what Caldwell was saying. Then when he's in Tennessee, he makes this phone call, and it was recorded, and we submitted the recording to the court, in which he tries to talk Robert Caldwell out of cooperating with the police. He tells them, I'll give you the keys of the kingdom. Look, I want you to walk away. But on that phone call, Caldwell repeatedly brings up Jamestown. That angers Sterling Roberts, and his last words on that phone call to Sterling Roberts, from Sterling Roberts to Bobby Caldwell, are, you just talk yourself out of this, and then releases a number of expletives indicating, look, if you're not going to walk away, if you're going to keep forward with this, then the deal is off. That's consistent if you read Laurie Cicero's testimony after, who talked to Sterling Roberts after the call. She says a couple times that Sterling Roberts wanted Bobby Caldwell to walk away. He didn't walk away. The next piece of evidence we have is actually the change in the MO and the modus operandi, between the first and the second attempts on Roberts' life. The initial attempt was carefully planned at a time when the kids were not going to be present. There is evidence in the record that this was intentional. Sterling Roberts tells a witness, I'm not that kind of monster. I wouldn't kill him in front of his kids. Something changes, though, because he does, in fact, kill them in front of the kids. And the fact is, Robert Caldwell is now going to testify about what happened at Jamestown. And that puts a ticking clock on the situation. Sterling Roberts, Tony Caldwell can no longer sit around and wait. They have to escalate their time frame. And we see that change in the modus operandi. And then the last piece of evidence Judge Bosch would point to is Sterling Roberts' statements after he's arrested. His statements to police are recorded. And in there, he references some of the statements that Bobby Caldwell made in his witness statement, are you ready to die, and deliberately attempts to downplay them and distance himself from there. And, again, that's kind of evidence that he was aware of what Caldwell was saying to the police. He knew this was a problem. So when he's apprehended in South Carolina, he makes a point to try and dispute that testimony as well. So all of those, if you take them together, we think far exceed the preponderance of the evidence standard here. And the district court correctly ruled on that. With respect to the phone calls, these are all made within, actually before I get to that, to address the harmless error question, even if the court were to find that there was some issue with the forfeiture by wrongdoing ruling by the district court. The government's position is this would be harmless beyond a reasonable doubt under Chapman. There are a number of places in the record where, in the trial testimony, where witnesses testified that Sterling Roberts was the person who orchestrated Jamestown and did so with the intent to kill Bobby Caldwell. James Harmon, who is Roberts' stepfather, testified that Sterling Roberts admitted this to him in his northern Kentucky home and that the intent was to kill him. Sterling Roberts' uncle also admitted that Sterling Roberts had told him that he had lured Caldwell to the farmhouse with the intent to kill him. And then there was a third witness, Mariah Crawford, who said that Roberts made similar statements to them as well. In addition to that, you have the 911 call in which Bobby Caldwell is describing the events and names Sterling and says he's going to be armed and dangerous. And you even have Roberts telling the officers on the recorded video that, yes, I was responsible for Jamestown. Now, he says he just wanted to beat up Bobby. He didn't want to kill Bobby. Obviously, that's disputed by the testimony of all the other witnesses. But even if you were to take Sterling Roberts' self-serving statements, an intent to beat up or cause harm is sufficient for a conviction under Count 1. And again, all these testimonial statements only go to Count 1. They don't implicate Count 3 at all. With respect to the phone calls, the district court did not use its discretion in admitting the Lori Cicero phone call and did not plainly err in admitting the Candace Caldwell phone call. They all occurred within five to ten minutes of the initial incident. He calls 911 while he's still being chased. It's a two-minute and 54-second call. Immediately calls Candace, his wife, afterwards. It's a 30-second call. And then immediately calls Lori Cicero after that. Both on the 911 call, he tells the operator, I'm shooken up. This is a startling event. I'm still under the stress of it. His wife testified that he was rushed. He was urgent. He was fearful. He was not talking as he normally would. And the purpose of that call to his wife was to get his wife and his kids out of his house. It was still an urgent situation. He immediately calls Lori Cicero afterwards. Lori Cicero also said that he was fearful and not calm. Fits within the excited utterance framework. And then even when he gets to the Jamestown Police Station, which is about a nine-minute drive, the deputy who met him there testified that he was shooken up even at that point. So under those conditions, under these circumstances, we don't think it was an abuse of discretion or plain air to admit those statements. Are there cases that hold that serial telephone calls can still be within the excited utterance exception? Or would this be a novel situation? I am not aware of any case law one way or the other on that. Thank you, Judge Moore. I think we cite Arnold and Maggard, I think, in our brief. And those collect cases which says you can have an hour to two-hour gap. So I'm not sure about the serial phone calls, but this easily falls kind of within the framework of what this court has said can still be an excited utterance. If there are no further questions, the government will rest on its brief and ask this court to affirm. Thank you. Just a couple of matters. And I would urge the court to not only listen to the 911 call, but listen to the other call that my opposing counsel referenced. The 911 call, the actual information in it is helpful to determine that these subsequent calls weren't an excited utterance. I'm going to disagree with my fellow counsel. In the 911 call, Mr. Caldwell is chasing Mr. Roberts. It's not the other way around, as he said. He's actually chasing Mr. Roberts. And what you hear in that call is some frustration on Mr. Caldwell's part because the 911 operator tells him to cease and desist going after Mr. Roberts. And he's actually upset about that. And she tells him, listen, that is a police matter. We'll take care of it. You go to the police station. Does it matter, though, what the cause of the excited excitement is? Here's where it matters. Because the exception of excited utterance is because you're trying to get a snapshot of the person's feelings upon seeing something without having time to reflect. So if he has time to reflect and then go after Mr. Roberts and then have this discussion, that all shows that this is not a reaction. This is now he's thinking through things. He's going to the next level. And that's why that's an important distinction. So even though the feelings are there, they don't get you to the exception. And so the only other thing I would say is, with regards to the other call, I would disagree with my colleague. Although there is a discussion about him going to the police, that whole discussion between Mr. Caldwell and Mr. Roberts, which, again, this court has and can review, is about Mr. Roberts' frustration with his girlfriend and wanting to assist Mr. Caldwell in the custody proceedings. And this is after the Jamestown incident. So if, in fact, he's trying to now kill him because he might testify as the Jamestown incident, it would not be logical then to assist him with the custody proceeding itself. And on top of that, even after he said, well, you know, to heck with you then, and they hung up, he actually took Mr. Caldwell's advice and then contacted Lori Sissow after that call and had a lengthy discussion with her as well. So for all these reasons, we would ask that you reverse the convictions in this case. Thank you. Thank you both for your argument, and the case will be submitted.